UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KAREN T. ESLIN,<br>     Plaintiff, | :<br>: | CIVIL ACTION NO.<br>3:11-cv-134 (JCH) |
| | : | |
| v. | : | |
| | : | |
| HOUSING AUTHORITY OF THE<br>TOWN OF MANSFIELD, et al.,<br>     Defendants. | :<br>:<br>: | JUNE 27, 2013 |

**RULING RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 76) AND DEFENDANT'S MOTION FOR PERMISSION TO FILE SURREPLY (Doc. No. 81)**

**I.     INTRODUCTION**

Plaintiff Karen T. Eslin brings this action against defendants Housing Authority of the Town of Mansfield ("MHA"), Rebecca M. Fields, in her official capacity as Executive Director of MHA, and Stacey Vangsness, in her official capacity as Section 8 Coordinator of MHA (collectively, the "defendants"). The Amended Complaint alleges two counts, each seeking injunctive relief, declaratory relief, and money damages under 42 U.S.C. § 1983. Count 1 claims that the defendants violated Eslin's rights under the United States Housing Act, 42 U.S.C. § 1437f. Count 2 claims that the defendants violated Eslin's right to due process under the Fourteenth Amendment of the U.S. Constitution. Eslin has filed a Motion for Summary Judgment (Doc. No. 76) on her requests for a declaratory judgment on both counts. The defendants contest the merits of each claim and also argue that relief should be denied because Eslin's rights were not violated by MHA's official policy or custom.

1

**II.    BACKGROUND**

   A. Facts

Eslin began participating in the Housing Authority's Section 8 Housing Choice Voucher Program (the "Section 8 Program") in January 2003. Pl.'s Local Rule ("L.R.") 56(a)1 Stmt. ¶ 5. Under the Section 8 Program, MHA made monthly payments of $621.00 to Eslin's landlords, Kathleen and Arthur Stearns ("the Stearns"), to cover a portion of the $900.00 monthly rent for Eslin's three-bedroom apartment unit. Id. ¶¶ 6, 8; Written Lease Agreement dated December 23, 2002 ("Eslin Lease") (Doc. No. 76-7) (defining "Landlord" as "Kathleen or Arthur B. Stearns"). These payments were made pursuant to a Housing Assistant Payments ("HAP") contract between MHA and Ms. Stearns. Pl.'s L.R. 56(a)1 Stmt. ¶¶ 6, 8. Eslin paid the balance of each month's rent herself. Id. ¶ 8.

The lease agreement between Eslin and the Stearns provided for a one-year term from January 1, 2003 to December 31, 2003, after which Eslin could continue to rent the unit from the Stearns, with their consent, on a month-to-month basis. Eslin Lease ¶ 1 ("The term of this lease starts on Jan. 1, 2003, and ends on Dec. 31, 2003."), ¶ 20 ("If you continue to occupy the Apartment with our consent after this lease ends, this lease will be on a monthly basis."). The lease agreement also provided that, after the initial one-year lease period, either party "can send a notice to the other and cancel this lease at any time." Id. ¶ 20.

Effective February 1, 2010, MHA approved an increase in Eslin's rent of the unit of $200.00 per month. Pl.'s L.R. 56(a)1 Stmt. ¶ 9. Under applicable regulations, Eslin, not the MHA, was responsible for paying this additional monthly cost. Id. ¶ 9.

On May 29, 2010, the Stearns sent Eslin a letter stating that they would not lease the unit to her beyond June 30, 2010.  Id. ¶ 10; Letter from Stearns to Eslin dated May 29, 2010 (Doc. No. 77-6) ("May 29 Stearns Letter"), Ex. B to Defs.' Opp. to Pl.'s Mot. Summ. J. ("Defs.' Opp.") (Doc. No. 77).  The Stearns also offered Eslin a two-bedroom unit "in the same house" that had a monthly rent of $850.00.  Id.  On June 8, 2010, Eslin sent the Stearns a signed letter, stating, among other things, that she had "no desire at all" to move to the other unit.  Letter from Eslin to Stearns dated June 8, 2010 (Doc. No. 77-14), Ex. J to Defs.' Opp.

On June 10, 2010, Vangsness sent Eslin a letter advising her that the Stearns had notified MHA that Eslin's lease would be terminated on June 30, 2010.  The letter also advised Eslin that no further Section 8 payments would be made on her behalf for her current unit and that, if she wanted to remain in the Section 8 Program, she needed to obtain a new housing voucher.  Pl.'s L.R. 56(a)1 Stmt. ¶ 11; Letter from Vangsness to Eslin dated June 10, 2010 (Doc. No. 77-9) ("June 10 MHA Letter"), Ex. E to Defs.' Opp.

On June 22, 2010, Eslin met with Vangsness and discussed Eslin's situation and rental options.  Id. ¶ 12.  The defendants allege that, at this meeting, Vangness advised Eslin that she had three options.  First, she could keep her current voucher if she obtained permission from the Stearns to stay in her current unit after June 30, 2010.  Second, she could be in "good standing" by paying her past due rent and obtaining a letter of confirmation from the Stearns, after which she could obtain a new voucher and move into a new unit.  Third, she could go "Zero HAP," a process whereby she would have six months to pay her past due rent and return to "good standing."  During this time, she would maintain eligibility in the Section 8 Program.  Aff. of Rebecca Fields

3

(Doc. No. 77-3) ("Fields Aff.") ¶¶ 12–15 ; Defs.' Opp. at 9–10.  The defendants also allege that Vangness told Eslin that, under the "Zero HAP" option, she would need to find alternative housing until she were returned to good standing.  Defs.' Opp. at 10.  Fields testified that Eslin rejected the latter two options, both of which would have required her to vacate her unit.  Fields Aff. ¶¶ 12–16.

On June 30, 2010, Vangsness sent Eslin a letter notifying her that her Section 8 Program benefits would be terminated as of July 31, 2010.  Pl.'s 56(a)1 Stmt. ¶ 13.  The letter also advised Eslin of her right to request an informal hearing to dispute the termination.  Id.  On July 10, Eslin sent a letter to MHA timely requesting an informal hearing to challenge the proposed termination of her Section 8 assistance.  Id. ¶ 14.  On July 12, 2010, Vangsness sent Eslin a letter acknowledging Eslin's request for a hearing and scheduled a hearing for August 5, 2010.  Id. ¶ 15.

The hearing was held on August 5, 2010, as scheduled.  Richard P. Long, Chairman of the Board of Commissioners of MHA, was the presiding hearing officer.  Id. ¶¶ 16–17.  The defendants allege that, at the hearing, both sides offered evidence in the form of documents and testimony.  Defs.' Opp. at 12.  On August 10, 2010, Long issued a decision sustaining MHA's decision to terminate Eslin from the Section 8 Program on the basis that Eslin had violated the Family Obligations requirements of the Section 8 Program.  Pl.'s L.R. 56(a)1 Stmt. ¶ 18; see Richard P. Long Decision, dated Aug. 10, 2010 (Doc. No. 61-3) ("Long Decision"), Ex. C to Am. Compl.  Later that month, counsel for Eslin sent a letter asking Fields to reverse Long's decision.  Shortly thereafter, Fields

4

sent counsel for Eslin a letter stating that Fields elected not to reverse Long's decision.[1] Pl.'s L.R. 56(a)1 Stmt. ¶¶ 19, 21.

  B. Procedural History

On August 31, 2012, the defendants moved to dismiss Eslin's claims under Federal Rule of Civil Procedure 12(b)(6), arguing that Eslin failed to allege that her federal rights were violated as a result of MHA's official policy or custom or the actions of MHA employees with final policymaking authority as required by the Supreme Court's decision in Monell v. Department of Social Services, 436 U.S. 658 (1978). See First Mot. Dismiss (Doc. No. 37). The court granted that Motion on January 13, 2012, but gave Eslin leave to replead her claims. See Ruling re: First Mot. Dismiss (Doc. No. 55) at 8. Eslin filed an Amended Complaint on February 13, 2012. Doc. No. 61.

On February 27, the defendants again moved to dismiss, arguing that Eslin's Amended Complaint still failed to state a claim under Monell. See Second Mot. Dismiss (Doc. No. 62). The court denied that Motion on July 12, 2012, noting that Eslin had "alleged facts sufficient to plausibly support her claim that Fields exercised final policymaking authority for MHA with regard to the termination of Eslin's Section 8 benefits." See Ruling re: Second Mot. Dismiss (Doc. No. 66) at 8. Eslin then filed this instant Motion.

## III. STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such

---

[1] Paragraphs 19 and 21 of Eslin's Local Rule 56(a)1 Statement, both admitted in relevant part by the defendants, appear to contain at least one typo. Paragraph 19 states that the letter from Eslin's counsel requesting reversal was dated August 26, 2010, but that the reply from Fields was sent on August 21, 2010. See Pl.'s L.R. 56(a)1 ¶¶ 19, 21; Defs.' Local Rule 56(a)2 Statement (admitting same). This error does not appear to affect either side's arguments.

5

issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. Of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV.   DISCUSSION

A. <u>Whether the Termination of Eslin's Benefits Violated Due Process.</u>

Eslin argues that the termination of her Section 8 benefits in July 2010 violated the Housing Act and the Due Process Clause of the U.S. Constitution for four reasons: 1) because the notice of termination was insufficient; 2) because the hearing officer failed to properly describe the reasons for his decision to terminate benefits; 3) because the decision to terminate Eslin's benefits was improper; and 4) because Eslin's benefits were improperly terminated before her hearing took place.

Federal regulations require a PHA to give a Section 8 family "an opportunity for an informal hearing" to consider whether the PHA's decision to terminate Section 8 benefits based on that family's action or failure to act was done "in accordance with the law, HUD regulations and PHA policies." 24 C.F.R. § 982.555(a)(1)(v). Courts in this district have held that whether a PHA's termination procedures complied with applicable federal regulations must be judged in light of constitutional due process requirements. <u>See</u> <u>Edgecomb v. Hous. Auth. of Vernon</u>, 842 F. Supp. 312, 314 (D. Conn. 1993) ("[P]laintiffs allege a failure to provide notice and a termination hearing in accordance with the [federal] regulations. . . . Whether the defendants' termination procedures in this case complied with the applicable regulations must be judged in light of the due process requirements of <u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970)."). Specifically, because Section 8 benefits constitute a property interest of the recipient family, a PHA must provide a notice "sufficiently specific to enable the applicant to prepare rebuttal evidence to introduce at his hearing appearance." <u>Id.</u> at 315 (quoting <u>Billington v. Underwood</u>, 613 F.2d 91, 94 (5th Cir. 1980)).

1. Was the Notice of Termination Sufficient?

Eslin argues that the notice of termination from the MHA violated federal regulations and due process because it "did not explicitly state that failing to vacate was the reason for the proposed action, nor d[id] it reference the legal authority relied upon for taking the action." Pl.'s Mem. Mot. Summ. J. at 20. Rather, it was not until her termination hearing that it "became clear" to her that the defendants wanted to terminate her Section 8 benefits "simply because she failed to vacate her home, after her landlords expressed their desire to terminate their lease with her." Id. The defendants argue that notice was sufficient under federal regulations and MHA policy, neither of which "requires that the notice 'reference the legal authority relied upon for taking the action.'" Defs.' Opp. at 24–25.

Federal regulations require that, when a participant family is entitled to a hearing, a PHA must give that family a "prompt written notice that the family may request a hearing. The notice must: (i) [c]ontain a brief statement of reasons for the decision, (ii) [s]tate that if the family does not agree with the decision, the family may request an informal hearing on the decision, and (iii) [s]tate the deadline for the family to request an informal hearing." 24 C.F.R. § 982.555(c). Similarly, the MHA Administrative Plan states that, for "decisions related to the termination of the family's assistance, . . . the notice must contain a brief statement of the reasons for the decision, a statement that if the family does not agree with the decision, the family may request an informal hearing on the decision, and a statement of the deadline for the family to request an informal hearing." Ch. 16 MHA Administrative Plan (Doc. No. 77-24), Ex. T to Defs.' Opp., at 16-10.

"Notice of a PHA's decision to terminate assistance . . . must be judged in light of [ ] due process requirements" and must be "sufficiently specific to enable the applicant to prepare rebuttal evidence to introduce at [her] hearing appearance." Edgecomb, 824 F. Supp. at 314–15 (alterations added) (alterations in original removed).  In Edgecomb, the court determined that the notice given there was insufficient because the statement that the plaintiff's benefits were being terminated for "having engaged in drug-related criminal activity or violent activity, including criminal activity by any family member" merely parroted the "broad language of the regulations" and failed to indicate "which family member committed proscribed acts, what the nature of the alleged crime was, or when the relevant acts were committed."  Id. at 315 (citations omitted).  The Edgecomb Court stated that a "proper notice in compliance with the [federal] regulations would state the particular felony and the person who allegedly committed it, and would give a brief factual statement concerning the incident."  Id.

Here, Vangsness sent Eslin the notice of termination on June 30, 2010.  Letter from Vangsness to Eslin dated June 30, 2010 (Doc. No. 77-7) ("Notice of Termination"), Ex. C to Defs.' Opp.  The Notice of Termination stated that Eslin's landlords had notified the MHA that Eslin's lease would terminate on June 30, 2010.  The Notice also referred to a June 10, 2010 letter that the MHA had sent to Eslin "confirming that your lease and HAP contract would be terminated effective June 30, 2010 and stating that this unit will not be available for you to rent after this date, and therefore no further Section 8 payments will be made on your behalf for this unit."  Id. (quotation marks omitted).  The Notice further referenced a June 22, 2010 meeting between Eslin and MHA, and subsequent follow-up telephone conversations, in which MHA alleges that it discussed

with Eslin what Eslin needed to do to remain "in good standing with your landlord and, consequently, with the Section 8 program." Id. The Notice then advised Eslin that, as of the date the Notice was sent, Eslin's landlord had not notified MHA that Eslin had paid her balance in full, moved out of the unit, or received permission from her landlord to remain in the unit. Id. Finally, the Notice stated that Eslin's Section 8 benefits would be terminated on July 31, 2010, and advised her of her right to request an informal hearing. Id.

A reasonable jury could find that the information MHA provided in its Notice was sufficient. The Notice differed in several ways from the one found to be insufficient in Edgecomb. First, the Notice to Eslin did not merely parrot the language of the federal regulations, but rather provided specific factual information from the MHA's point of view about the events leading up to the Notice. A reasonable factfinder could conclude that the first three paragraphs in the Notice, which described MHA's interactions with Eslin and Eslin's landlords, constituted, at a minimum, a "brief factual statement concerning the incident." See Edgecomb, 824 F. Supp. at 315. Second, the Notice informed Eslin that she had failed to pay her balance in full, move out of the unit by June 30, or receive permission from her landlord to remain in the unit past June 30, and that "[t]herefore," her Section 8 benefits were being terminated. A reasonable factfinder could conclude that this information was "sufficiently specific to enable [Eslin] to prepare rebuttal evidence" at her hearing. Id. Finally, Eslin has not cited authority to support her claim that MHA violated due process by not specifically referencing the legal authority for its decision to terminate her benefits. See 24 C.F.R. 982.555(c)(2)(i) (requiring a "brief

10

statement of reasons for the decision"). Accordingly, the court denies summary judgment for Eslin on this issue.

2. Did the Hearing Officer Properly Describe the Reasons for His Decision?

Eslin also argues that the defendants violated due process because the hearing officer failed to properly describe the reasons for the decision to terminate Eslin's Section 8 benefits. According to Eslin, the hearing officer did not describe the evidence upon which his decision relied, state the specific actions or inactions that justified the decision, or cite a legal basis for the decision. Pl.'s Mem. Mot. Summ. J. at 21. The defendants argue that the hearing officer's written decision comports with due process and the federal regulations. Defs.' Opp. at 27–28.

During the informal hearing provided for in the federal regulations, the parties must have the opportunity to present evidence and question witnesses, but such evidence "may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings." 24 C.F.R. § 982.552(e)(5). After the hearing, the hearing officer must "issue a written decision, stating briefly the reasons for the decision." 24 C.F.R. § 982.552(e)(6). Any factual determinations by the hearing officer "shall be based on a preponderance of the evidence presented at the hearing." Id. The MHA Administrative Plan policy states that written decisions should include the following information: (1) general hearing information, (2) a brief statement of the reason for the hearing, (3) a summary of the testimony of the evidence, including by identifying "any documents that a witness produced in support of his/her testimony and that are admitted into evidence," (4) all findings of fact "based on a preponderance of the evidence," and (5) a conclusion "derived from the facts" and which "result[s] in a

determination of whether these facts uphold the PHA's decision." Ch. 16 MHA Administrative Plan, at 16-13 to 16-14.

Based on the record before the court, a reasonable jury could find that the hearing officer's written decision satisfied the requirements of due process and the federal regulations. The written decision in Edgecomb was deemed insufficient under due process and the federal regulations because it "did not state the elements of fact or law on which the decision to uphold the termination of assistance was based," and because it failed to "specify the reasons for [the hearing officer's] determination or indicate the evidence on which it rested." Edgecomb, 824 F. Supp. at 316.

Here, the hearing officer issued a written decision on August 10, 2010, five days after the informal hearing on August 5, 2010. See Long Decision. That decision included eight separate facts that the hearing officer determined "[f]rom the evidence presented at the Hearing." Id. at 1–2. Within those stated facts, the officer lists documentary evidence that was introduced at the hearing, including letters exchanged between Eslin and her landlords. Id. at 1. The officer also stated the legal basis for his decision when he concluded that, based on the preponderance of the evidence, Eslin had "violated [the] Family Obligations of the Section 8 Program," and that he concurred with the MHA's decision to terminate her Section 8 benefits.[2] Id. Eslin argues that courts have found the federal regulation unsatisfied when notices of termination and informal hearing decisions "omitted critical information," Pl.'s Mem. Mot. Summ. J. at 22, but has not come forward with evidence of what "critical information" is lacking here,

---

[2] The officer also stated that the MHA Administrative Plan's list of when landlords may terminate a lease before the end date of the lease was inapplicable here because "the HAP contract terminates automatically if the lease is terminated by the owner," and "the lease was on a month-to-month basis and 30 days['] notice was given by the landlord." Long Decision at 2.

such that the decision fails to constitute a "brief statement of reasons for the decision," see 24 C.F.R. § 982.555(c). Accordingly, the court concludes that a genuine issue of material fact exists as to whether the written decision complied with due process and the federal regulations and does not grant summary judgment to Eslin on that issue.

> 3. Was the Defendants' Failure to Vacate a Proper Reason for Terminating Eslin's Section 8 Benefits?

Eslin's next argument is that the defendants violated due process because the stated basis for the termination of her Section 8 benefits—that Eslin failed to vacate the premises after the termination of her lease—was improper. Eslin argues that the MHA did not have the authority to terminate Eslin's benefits for reasons other than those explicitly stated in 24 C.F.R. § 982.552, and that a "Section 8 tenant may be required to move only by court eviction and only for the reasons and in the manner authorized by Congress and HUD." Pl.'s Mem. Mot. Summ. J. at 23 (citing 24 C.F.R. § 982.310). The defendants respond that Eslin's failure to vacate after her landlords terminated her lease constituted a "serious violation of the lease," which is prohibited in the list of "family obligations" of the Section 8 program. See Defs.' Opp. at 28–29.

The court concludes that a genuine issue of material fact exists because a reasonable factfinder could find that failing to vacate a unit after a lease is terminated qualifies as a "serious violation" of a lease. Eslin cites a non-binding district court case to support her argument that a PHA lacks discretionary authority to "'impose additional grounds for denying or terminating assistance as a result of a [Section 8 participant's] actions or inactions.'" Pl.'s Mem. Mot. Summ. J. at 23 (quoting Hill v. Richardson, 740 F. Supp. 1393, 1398 (S.D. Ind. 1990)). However, that statement does not preclude the defendants' argument. Here, as in Hill, one of the stated grounds for terminating

assistance is the violation of "any Family obligation under the Section 8 . . . Program." Hill, 740 F. Supp. at 1396. Eslin argues that section 982.551 "makes no mention of vacating the premises at the end of the lease as a family obligation." Pl.'s Mem. Mot. Summ. J. at 23. Although this is true, one of the family obligations listed in the federal regulations is that the family "may not commit any serious or repeated violation of the lease." 24 C.F.R. § 982.551(e). The defendants' position is that remaining in a unit after the termination of a lease constitutes a serious violation of the lease because it involves failing to abide by the stated lease term, which is an "essential term" of a tenancy agreement. Thus, MHA is not adding an additional ground for terminating assistance, but rather is terminating assistance based on one of the stated grounds for termination—a serious or repeated violation of a lease. See Defs.' Opp. at 28–29 (citing Enterprise Leasing Corp. v. Dixon, 1 Conn. App. 496, 499 (1984)). Moreover, Eslin has not cited case law or regulations that provide that failing to vacate a unit upon the expiration of a lease does not or cannot constitute a "serious violation" of a lease. She states that "the decision to terminate a lease may be made only by the owner of the property," and that a "Section 8 tenant may be required to move only by court eviction," but neither of those statements answers the question of whether MHA may terminate Section 8 benefits for a failure to vacate. See Pl.'s Mem. Mot. Summ. J. at 23 (emphasis added). Accordingly, the court concludes that a genuine issue of material fact exists as to whether Eslin's failure to vacate constituted a "serious violation" of her lease, and thus was proper grounds for the termination of her benefits, and does not grant summary judgment for Eslin on that issue.[3]

---

[3] Eslin suggests that she could not have violated her lease by failing to vacate if the lease terminated on June 30, 2010, because she would have not been obligated, as a tenant at sufferance, to

14

> 4. Did the Defendants Improperly Terminate Eslin's Section 8 Benefits Prior to the Informal Hearing?

Finally, Eslin argues that the defendants improperly terminated her Section 8 benefits before her informal hearing took place. The parties do not dispute that the defendants terminated Eslin's Section 8 payments on or around July 1, 2010, approximately one month prior to the August 5, 2010 informal hearing. However, the parties disagree as to the status of Eslin's lease at the time of termination.

Eslin argues that the termination of her benefits prior to the informal hearing was improper because, at that point, she was not evicted and had not been terminated from the Section 8 program. See Pl.'s Mem. Mot. Summ. J. at 29. She contends that the Stearns' May 29 letter telling her that the unit would not be available to her after June 30 was insufficient to constitute a termination of the month-to-month lease under state law. Id. at 28. Rather, she argues that her lease was terminated either on July 1, 2010, the date "when the landlords' letter was to be effective," or on August 12, 2010, "when the notice to quit possession was issued." Id. at 28–29. Regardless of the operative date, Eslin argues that MHA could not terminate her benefits on July 1, 2010, because at that point, she had been neither evicted from the unit nor terminated from the Section 8 program. Id. at 29. In support, she cites a provision of the federal regulations that states:

---

comply with the terms of the lease. See Pl.'s Reply Br. (Doc. No. 80) at 6 (citing Sproviero v. J.M. Scott Assocs., Inc., 108 Conn. App. 454, 462 (2008)). However, unlike here, the landlord in Sproviero had issued a notice to quit and commenced the eviction process. See id. at 462.

Regardless, a reasonable factfinder could find that Eslin's failure to vacate the unit at the end of her lease was a serious violation of the lease, particularly considering that the lease provided that the Stearns would not be required to ask Eslin to vacate the apartment once the lease terminated. See Eslin Lease ¶¶ 14–15 (permitting Stearns to send notice canceling lease, and providing that Stearns would not need to send notice telling Eslin to vacate the unit).

> Housing assistance payments terminate when the lease is terminated by the owner in accordance with the lease. However, if the owner has commenced the process to evict the tenant, and if the family continues to reside in the unit, the PHA must continue to make housing assistance payments to the owner in accordance with the HAP contract until the owner has obtained a court judgment or other process allowing the owner to evict the tenant.

24 C.F.R. § 982.311(b). Eslin interprets this regulation to mean that MHA should have continued to make HAP payments to the Stearns until the hearing process was completed.

The defendants argue that the May 29 letter "constituted proper notice of termination of the written lease agreement," and that the lease terminated on June 30, 2010, as stated in the letter and in accordance with the terms of the lease agreement. Defs.' Opp. at 19; Eslin Lease ¶ 20 (permitting either party, after the initial one-year term, to "send a notice to the other and cancel this lease at any time"). The defendants also argue that the HAP contract ended when the lease terminated on June 30, 2010; and that, under federal regulations, MHA was neither obligated nor permitted to continue to make HAP payments to the Stearns after that date. See Defs.' Opp. at 8, 18–23.

This court declines to grant summary judgment to Eslin on this issue. First, Eslin's lease terminated on June 30, 2010. The lease agreement states specifically that, after the initial lease term ended on December 31, 2003, the lease would convert to a month-to-month lease that either party could terminate upon notice to the other party. Eslin Lease ¶¶ 1, 20. Eslin argues that the May 29 letter was insufficient to terminate the lease because a "lease is terminated only by an issuance of a notice to quit, pursuant to Conn. Gen. Stat. § 47a-23." See Pl.'s Reply Br. (Doc. No. 80) at 3.

16

However, section 47a-23 requires a landlord to serve a notice to quit in order to start the process to obtain possession, i.e., as "a foundation for a summary process action." See City of Bridgeport v. Barbour–Daniel Electronics, Inc., 16 Conn. App. 574, 583 (1988); see also Conn. Gen. Stat. § 47a-23(a). Section 47a-23 clearly contemplates that the issuance of a notice to quit may occur after the lease has already been terminated. See id. ("When the . . . lessor . . . desires to obtain possession or occupancy of . . . any dwelling unit, . . . and when a rental agreement or lease of such property . . . terminates[,] . . . such . . . lessor . . . shall give notice to each lessee . . . to quit possession or occupancy . . ." (emphasis added)). Rather, all that is required to terminate a lease is "some unequivocal act which clearly demonstrates . . . intent to terminate the lease." City of Bridgeport, 16 Conn. App. at 584 n.8 (citing Chapel–High Corp. v. Cavalaro, 141 Conn. 407, 411 (1954)). Such an act occurred here.

The Stearns' May 29 letter demonstrated the Stearns' desire to terminate the lease on June 30, 2010, when it stated, "We are unable to continue to make [the unit] available to you beyond 6/30/10. This unit, unfortunately, has become unaffordable to you." May 29 Stearns Letter. Thus, the letter operated as a termination of the lease as of June 30, 2010, the date specified in the letter, regardless of whether it was sufficient to serve as a basis for a summary eviction action.[4] See, e.g., City of Bridgeport, 16 Conn. App. at 584 n.9 ("Although the letter constituted the unequivocal act necessary to terminate the lease, it did not conform to the substantive requirements of General

---

[4] In Sandrew v. Pequot Drug, Inc., 4 Conn. App. 627 (1985), which Eslin cites, the court held that a letter from a landlord, informing his tenant that the tenancy was terminated, did not constitute a notice to quit. Id. at 632. However, that court also distinguished between a notice to quit and a notice terminating a lease, noting that an action that was insufficient to serve as a notice to quit could nonetheless terminate a lease. See id. at 631 ("[T]here is almost no limit to the possible words or deeds which might constitute the unequivocal act necessary to terminate the lease. . . . [An] unequivocal act [could] be sufficient to terminate all rights arising under a lease although not furnishing a foundation for a summary process action.").

17

Statutes § 47a-23(b), and therefore did not constitute a notice to quit.  As such, the letter did not furnish a foundation for a summary process action." (internal citation omitted)).

Second, federal regulations and MHA policy state that the HAP contract ends, and thus MHA payments are terminated, when the lease is terminated.  See 24 C.F.R. § 982.309(b) (stating that the "term of the HAP contract begins on the first day of the lease term and ends on the last day of the lease term"), § 981.311(a) (stating that HAP payments "may only be paid to the owner during the lease term"), § 982.451(a)(2) (stating that "[t]he term of the HAP contract is the same as the term of the lease"); Chapter 15:  Terminations of Assistance and HAP Contracts, HUD Housing Choice Voucher Program Guidebook (Apr. 2001), at 15-3 to 15-4, http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_11759.pdf (providing for "[a]utomatic [t]ermination" of the HAP contract when "[t]he owner or family terminates the lease"); see also Augusta v. Cmty. Dev. Corp. of Long Island, Inc., No. 07-CV-0361 (JG) (ARL), 2008 WL 5378386, *2 n.5 (E.D.N.Y. Dec. 23, 2008) (discussing lease where, "[u]nder its terms, the HAP contract terminates automatically if the lease is terminated by the owner or the tenant").

Third, Eslin cites regulations and case law to support her argument that HAP payments must continue until a tenant is evicted or terminated from the Section 8 program.  However, those regulations and case law pertain to situations where there is an existing lease and an outstanding HAP contract; thus, they are inapplicable here. See, e.g., 24 C.F.R. § 982.311(b) (requiring a PHA to continue to make HAP payments "in accordance with the HAP contract" to an owner seeking to evict a tenant "until the

18

owner has obtained a court judgment or other process allowing the owner to evict the tenant" (emphasis added)); 24 C.F.R. § 982.555(a)(2) (requiring the opportunity for an informal hearing "before the PHA terminates [HAP] payments for the family under an outstanding HAP contract" (emphasis added)); Lowery v. D.C. Hous. Auth., No. Civ.A. 04-1868 (RMC), 2006 WL 666840, *9 (D.D.C. Mar. 14, 2006) (requiring PHA to provide hearing "before it ceases to subsidize the rent of a family with an outstanding HAP contract" (emphasis added)).[5] This court is unaware of any binding case law or federal regulation that requires a PHA to continue to make HAP payments where, as here, there is no outstanding HAP contract.

This court finds that, as a matter of law, at the time MHA ceased making HAP payments, Eslin's lease had terminated and there was no outstanding HAP contract under which HAP payments could be made.[6] Accordingly, the court does not grant summary judgment for Eslin on the issue of whether the defendants violated due process by terminating Eslin's Section 8 payments prior to the hearing.

---

[5] Eslin also cites two non-binding Massachusetts state cases. In the first, Ellerbee v. N. Andover Hous. Auth., No. 09-cv-26 (Mass. NE Hous. Ct. Apr. 27, 2009), Att. B (Doc. No. 76-4) to Pl.'s Mem. Mot. Summ. J., the Northeast Housing Court of Massachusetts held that a PHA that "terminated the tenant's participation in the Section 8 Housing Choice Voucher Program" was liable for HAP payments to the landlord "until the tenant vacates." Id. at 2, 4. However, that statement came in the context of the court's finding that a PHA could not "unilaterally alter the terms of the HAP contract with the landlord," id., thus presupposing an existing HAP contract. In the second case, DeProfio v. Waltham Hous. Auth., No. 071498, 2007 WL 2367594 (Mass. Super. Ct. July 17, 2007), at all times relevant to that case, the plaintiff's "rental agreement ha[d] been governed by a lease between her and . . . her landlord." Id. at *1.

[6] MHA filed a Motion for Permission to File Surreply (Doc. No. 81). Eslin objected to the Motion. See Obj. to Mot. for Permission to File Surreply (Doc. No. 82). In its Motion, MHA cites a case in which the Superior Court of Connecticut recently held, in a suit by the Stearns against MHA regarding the same incidents, that "Stearn's letter to Eslin constituted proper notice that the lease was being terminated as of June 30, 2010," and that "the HAP contract was terminated as of June 30, 2010." Stearns v. Hous. Auth. of the Town of Mansfield, No. CV116004218S, 2013 WL 1849278, *2 (Conn. Super. Ct. Apr. 9, 2013). The court grants MHA's Motion, but does not rely on the state court decision referenced within.

B. Monell Requirement

Because the court did not grant summary judgment to Eslin with respect to her due process claims, it does not reach the question of whether Fields' actions are sufficient to establish liability against MHA under Monell v. Department of Social Services, 436 U.S. 658 (1978).

V. CONCLUSION

For the foregoing reasons, MHA's Motion for Permission to File Surreply (Doc. No. 81) is **GRANTED**, and Eslin's Motion for Summary Judgment (Doc. No. 76) is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 27th day of June, 2013.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge